THE FIRST COMMERCIAL BANK OF PONTIAC v. JAMES TALBERT.

103  625
142  ²294

*Partnership—Dissolution—Subsequent indorsements of firm name —Construction of written authority—Banks and banking—Reorganization of bank.*

1. A member of an insolvent banking firm sent to the cashier of a national bank, which held a large amount of commercial paper indorsed by the firm, a writing authorizing his copartner to use his name " as one of the firm   *   *   *   as indorsers on paper " sent to the cashier to renew the indorsed paper. And it is held that the intent was to authorize the continuance of the use of the *firm name* as indorser.

2. The holder of the paper continued for about eight years to do business as a national bank, when it was reorganized as a State bank under 3 How. Stat. § 3208b6, which authorizes such reorganization, and provides that " thereupon all assets, real and personal, of said dissolved national bank shall, by act

103 MICH.—40.

of law, be vested in and become the property of such State bank, subject to all liabilities of said national bank not liquidated under the laws of the United States before such reorganization." And it is held that said authority inured to the benefit of said State bank, and authorized the indorsement of said firm name upon a renewal note taken by said State bank for the unpaid portion of a note held by said national bank at the time said authority was given.

3. Said authority should not be construed as confined to the renewal of the particular notes held by the national bank at the time it was given, but with reference to the known situation of the parties, and the evident purpose with which the authority was given, which very plainly was to invest the copartner to whom it was given with a discretion to continue said renewals until the paper could be retired by collection.

Error to Saginaw. (Wilber, J.) Argued November 22, 1894. Decided January 22, 1895.

*Assumpsit.* Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Weadock & Purcell* (*A. C. Baldwin,* of counsel), for appellant.

*Humphrey & Grant,* for defendant.

MONTGOMERY, J. In 1884, Leroy Moore & Co., composed of Leroy Moore and defendant, James Talbert, were engaged in the banking business at Greenville, Mich., and in June of that year closed their doors. At this time the First National Bank of Pontiac held about $50,000 of commercial paper with the indorsement of Leroy Moore & Co. Mr. John D. Norton, cashier of the First National Bank, had an interview with the defendant, Talbert, in which Mr. Norton stated to the defendant that the bank held this amount of paper, and should, for its protection, have some writing to hold the defendant, Talbert, on renewals. Subsequently an authority in writing was sent to the bank in the following terms:

"GREENVILLE, MICH., Sept. 15, 1884.
"JOHN D. NORTON, Cashier.

"*Dear Sir:* I hereby authorize Leroy Moore to use my name as one of the firm of Leroy Moore & Co. as indorsers on paper sent you for renewals.

"Very respectfully, JAMES TALBERT."

Among the paper held by the bank at the time of the suspension of Leroy Moore & Co. were notes amounting to upwards of $5,000, signed by C. S. D. Harroun. The paper of Harroun was renewed from time to time, and reduced until the note in suit represents the unpaid portion of his paper. The present note was taken by the plaintiff, the First Commercial Bank. The First National Bank continued business until January 1, 1893, when the First Commercial Bank was organized under the State banking law, and the testimony tends to show that the only change was a reorganization, the First Commercial taking all the paper of the First National, and assuming all its liabilities, and having the same stockholders and the same officers and board of directors.

Three contentions were made by the defendant on the trial:

1. That the authority relied upon was not an authority to indorse the firm name of Leroy Moore & Co., but the name of James Talbert.

2. That the authority was to indorse paper held by the First National Bank only, and not paper held by the First Commercial Bank.

3. That the authority cannot be held to authorize repeated renewals, but must be limited to renewals of paper held by the bank on September 15, 1884, or at the most that defendant could not be held by renewals after such original paper would have outlawed. (

The circuit judge directed a verdict for the defendant, and plaintiff appeals.

1. We do not think the authorization open to the construction contended for by the defendant. It is suggested

that, the authority being "to use my name," it should be construed as authorizing Moore to sign the individual name of Talbert, and not the firm name. But we think it clear that the intent was to authorize the continuance of the use of the firm name. In no other way would the name of Talbert be signed as a member of the firm of Leroy Moore & Co.

2. Defendant also insists that, the authority being directed to John B. Norton as cashier of the First National Bank, the plaintiff could not act upon it, and charge the defendant; and cases are cited in which the guaranty of payment of obligations to be in the future incurred to a particular firm has been held not to bind the guarantor to meet obligations incurred by purchases made of another or different firm, even though the firm be the successor to the firm addressed. The case of *Crane Co. v. Specht,* 39 Neb. 123, is a case of this character. There is much force in the contention of plaintiff that the authorization in question is something more than a guaranty of payment, and is in the nature of a continuation of the partner's authority to bind the banking firm of Leroy Moore & Co. by indorsement, and that the instrument should not be construed with the same strictness as an ordinary guaranty, but more as in the nature of a continuation of the copartnership for the purpose of dealing with the paper then held by the bank. But, however this may be, we think that the First Commercial Bank is substantially identical with the First National. The State banking law (3 How. Stat. § 3208*b*) authorizes the reorganization of a national bank as a State bank. It provides:

" Thereupon all assets, real and personal, of said dissolved national bank shall, by act of law, be vested in and become the property of such State bank, subject to all liabilities of said national bank not liquidated under the laws of the United States before such reorganization."

It was evidently under this statute that the reorganization was effected, as the testimony is that the First Commercial took all the paper of the First National, and assumed all the liabilities, and had the same board of directors and stockholders at the time of it.   In the well-considered case of *Bank v. Phelps*, 97 N. Y. 44, a question which we think is precisely analogous to the one here under consideration was considered.   The court held that a national bank, which was a reorganization of a former state bank, retained its identity so that a guaranty of payment made to the state bank could be enforced by the reorganized national bank.   It was said:

"All property and rights which they held before organizing as national banks are continued to be vested in them under their new *status*.  Great inconveniences might result if this saving of their existing assets did not include pending executory contracts and pending guaranties as well as vested rights of property.  Although, in form, their property and rights as state banks purport to be transferred to them in their new *status* as national banks, yet in substance there is no actual transfer from one body to another, but a continuation of the same body under a changed jurisdiction.   As between it and those who have contracted with it, it retains its identity, notwithstanding its acceptance of the privilege of organizing under the national banking act."

3. Nor do we think that the authorization should be construed as limiting the authority to one to make the renewals of the particular notes then held by the bank. The statement should be construed with reference to the known situation of the parties, and the evident purpose with which it was executed, which very plainly was to invest Moore with a discretion to continue these renewals until the paper could be retired by collection.

The judgment will be reversed, and a new trial ordered.

The other Justices concurred.