JEWETT CITY SAVINGS BANK *vs.* BOARD OF EQUALIZATION OF THE STATE OF CONNECTICUT.

THE NORWICH SAVINGS SOCIETY *vs.* BOARD OF EQUALIZATION OF THE STATE OF CONNECTICUT.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued October 4th, 1932—decided February 7th, 1933.

*Charles V. James,* with whom, on the brief, was *Arthur M. Brown,* for the appellant (plaintiff, Jewett City Savings Bank).

*John P. Huntington,* for the appellant (plaintiff, The Norwich Savings Society).

*Ernest L. Averill,* Deputy Attorney-General, and *H. Roger Jones,* Assistant Attorney-General, with whom was *Warren B. Burrows,* Attorney-General, for the appellee (defendant).

HAINES, J. These appeals involve essentially the same questions and, though separately brought and reserved, were argued and will be considered together.

Some of the funds of the plaintiffs are invested in certain corporate shares which they claim to be exempt from taxation under the provisions of General Statutes, § 1286, and in making returns to the tax commissioner on January 1st, 1931, under the provisions of General Statutes, § 1285, of their total savings deposits exclusive of surplus, they deducted as exempt from tax, their respective investments in the shares referred to, at the valuation thereof fixed by the defendant board of equalization. The Jewett City Savings Bank made thus a deduction of $37,675 for two hundred and seventy-five shares, and the Norwich Savings Society $137,000 for one thousand shares, of The Thames Bank & Trust Company of Norwich in this State. The exemption was disallowed by the defendant, and the plaintiffs, under protest, paid their tax without the deductions which they sought, and brought these appeals to determine the taxable character of these investments under the statute referred to.

These plaintiffs are mutual savings banks chartered by the State of Connecticut and located, respectively, in Griswold and Norwich in New London County. The most important of the facts in the stipulations may be summarized as follows: In 1825 the General Assembly chartered The Thames Bank with $200,000 capital, which in 1854 was increased to $500,000. It operated until about December 31st, 1864, and without the powers of a trust company. In December, 1864, the owners of two-thirds of the stock of the bank voted "to change and convert said Bank into a National Banking Association," and articles of association were adopted, the name being changed therein to The Thames National Bank, and the capital of the bank fixed at $500,000, being five thousand shares of $100 each. Upon such conversion the stockholders of The Thames Bank became stockholders in The Thames National Bank, by exchanging their shares of the former for the shares of the latter, share for share. On the 31st of that month, the directors of The Thames Bank voted to transfer "to the books of The Thames National Bank, into which said Thames Bank has been converted," the "business, deposits, and assets of The Thames Bank." They also voted at the same meeting that the capital stock of The Thames National Bank "be increased to $1,000,000." The Comptroller of the Currency issued his certificate of authority to The Thames National Bank December 29th, 1864, and from December 31st, 1864, to January 10th, 1865, the directors and officers of The Thames Bank acted in the same capacity for The Thames National Bank, and then were duly elected as directors and officers of the last named bank. On March 16th, 1865, the Deputy Comptroller of the Currency certified that the capital stock of the bank had been increased to $1,000,000, and the bank continued to

operate as a national banking association from January 1st, 1865, to August 2d, 1929, when it was liquidated. On June 29th, 1929, the directors of The Thames National Bank voted to "approve the conversion of The Thames National Bank from a National Banking Association to a State Bank," to operate under the charter originally granted by the General Assembly to The Thames Bank in May, 1825, and that The Thames National Bank be liquidated, and on August 2d, 1929, this was approved at a meeting of the stockholders, who also voted "That this Bank, having voted to liquidate as a national banking association, does now resume under the General Statutes of this State all its rights and powers under its original charter from the State of Connecticut, granted in May, 1825, together with all other rights given to all state banks and trust companies under the general laws of this State, in the same manner and to the same extent as if said charter, rights and powers had not been suspended by becoming a national banking association. . . ." The applicable statutory sanction for these conversions was contained in Public Acts of 1864, Chap. 48, General Statutes, Rev. 1866, p. 156, §§ 330-332, appearing in the footnote, and now Gen-

Sec. 330. Whereas, it is feared by the banks of this State that by becoming national banking associations, they may lose irrevocably their present charters and that by afterwards ceasing, through legislation of congress or otherwise to be national banking associations, they may then wholly and forever cease to exist; for the purpose of facilitating and rendering safe the change of such banks into national associations;—Any bank of this State which has become or may hereafter become a national banking association, shall be deemed to have done so upon the faith of the promise and assurance of this State, hereby pledged, that the rights and guarantees hereby offered to and conferred upon said banks, in the several provisions of this act, shall not be revoked or impaired.

Sec. 331. The charter of any such bank shall not be deemed surrendered, revoked, altered or amended by the action of such

eral Statutes, §§ 3939, 3946, 3948, and the Federal Act of June 3d, 1864. It was further voted: "That this bank as a state bank does hereby resume and agree to pay all obligations and claims of all creditors of said national banking association, and that this bank as a state bank will continue faithfully to discharge and perform all duties heretofore imposed upon it as a national bank association in any fiduciary capacity whatsoever." Thereafter, by vote, an offer was made to the Liquidating Agent of The Thames National Bank, on behalf of The Thames Bank, "to purchase all the assets and good will of The Thames National Bank," which offer was accepted and The Thames Bank thereupon took over all such assets and good will, and on August 2d, 1929, the bank commission of the State of Connecticut issued its certificate of authority to The Thames National Bank to resume business as a state bank, and The Thames Bank from that date carried on the business of a state bank until about November 30th, 1929; the stockholders, officers and directors were the same as when operations were

---

bank in becoming a national banking association, nor by the operation of this act; but by such action of such bank, and from the time of such action, said charter shall be deemed suspended, (except so far as the same shall remain in force by virtue of the three hundred and thirty-fifth section of this act), and shall continue so suspended until such bank shall cease to be a national banking association.

Sec. 332. Whenever any such bank, after having been a national banking association, shall cease to exist as such national banking association, (either by expiration of the time now limited by act of Congress for the existence of such associations, or in consequence of future legislation by Congress, or by the operation of any other cause, involving no censure of such banking association,) the now existing charter of such bank shall thereupon cease to be suspended, and shall again be in full force in every respect whatsoever; and such bank shall then resume all the rights and powers which it now possesses, in the same manner, and to the same extent, as if said charter, rights and powers, had never been suspended.

being carried on as a national bank, the assets remained the same and the stockholders of The Thames Bank continued to hold their certificates which had been issued to them by The Thames National Bank. On the last named day The Thames Bank "consolidated as provided by statute" with The Bankers Trust Company, adding the words "Trust Company" to its name to read "The Thames Bank & Trust Company," and thereupon the "stockholders of said Thames Bank became stockholders of said Thames Bank & Trust Company by exchanging their Thames Bank stock for stock in said Thames Bank & Trust Company." The two hundred and seventy-five shares of The Thames Bank & Trust Company held by The Jewett City Savings Bank on January 1st, 1931, when the return to the tax commissioner was made, resulted from an initial investment by that bank in two hundred and seventy-five shares of the stock of The Thames National Bank before April 1st, 1901. The one thousand shares of The Thames Bank & Trust Company held by The Norwich Savings Society on January 1st, 1931, resulted from an initial investment in three hundred shares of The Thames Bank in January, 1865, and a total investment of seven hundred shares in The Thames National Bank, and all before February 28th, 1901. All these shares were exchanged for an equal number of shares in The Thames Bank & Trust Company after the consolidation.

The substance of the four questions upon which the advice of this court is sought, is whether the market value of the shares of stock so held by the plaintiffs was exempt from tax under the provisions of General Statutes, §§ 1285, 1286.

For the purpose of taxation, § 1285 requires an annual report to the tax commissioner by each savings bank, as of January first, of the amount of its deposits

exclusive of its surplus, and of certain specified items exempt from taxation, including in the latter "the amount exempted from taxation by the provisions of section 1286" which appears in the footnote.

Basically, the contention of the plaintiffs is that from the time of the original purchases by them to the time the report was made to the tax commissioner, the identity of their investments had remained unchanged and that their holdings in the stock of The Thames Bank & Trust Company thus were investments which had been made before April 1st, 1901, within the meaning and intent of General Statutes, § 1286, the shares originally purchased being those of institutions described in General Statutes, § 1272.

The defendant maintains, on the contrary, that an investment in shares of The Thames Bank lost its identity when that bank was converted to The Thames National Bank, and, further, that an investment in the shares of the latter lost its identity when the national banking association was liquidated, and the status of a state bank resumed, and again when the consolidation with The Bankers Trust Company took place.

It will be seen that both plaintiffs became owners of their shares in The Thames National Bank prior to April 1st, 1901, and these identical shares were exchanged for the shares of The Thames Bank & Trust Company which they held January 1st, 1931.

---

Sec. 1286. SAVINGS BANKS EXEMPT FROM TAXATION ON CERTAIN INVESTMENTS. Any savings bank which, on April 1, 1901, had made investments in the shares of the capital stock of any of the corporations specified in sections 1272 and 1273 shall, so long as such funds remain so invested, or, in case of the merger of any of the corporations referred to in said sections, then in the shares taken in exchange in such merger, be exempt from the payment of the tax required by section 1285 to the amount of the market value of such shares as determined by the board of equalization.

By the statute law of this State, the corporate existence of The Thames Bank was not terminated when that bank became a national bank, and the laws of the United States were to the same effect. General Statutes, Rev. 1866, p. 156, §§ 330, 331, 332; Act of June 3d, 1864, Chap. 106, § 44, 13 U. S. Stat. at Large, p. 112, U. S. Code Anno., Title 12, § 35, note p. 84.

As to the meaning and intent of the Act of June 3d, 1864, the Supreme Court of the United States referred to a decision in the State of New York, that the change or conversion of The Metropolitan Bank into The Metropolitan National Bank did not "close its business of banking" nor destroy its identity or its corporate existence, but simply resulted in a continuation of the same body, with the same officers and stockholders, the same property, assets and banking business, under a changed jurisdiction; that it remained one and the same bank and went on doing business uninterruptedly. The Supreme Court said: "This decision is so manifestly correct that it needs no argument to sustain it." *Metropolitan National Bank* v. *Claggett*, 141 U. S. 520, 527, 12 Sup. Ct. 60, affirming 4 N. Y. Sup. 115, 10 N. Y. Sup. 165, 125 N. Y. 729, 26 N. E. 757; *Michigan Ins. Co.* v. *Eldred*, 143 U. S. 293, 12 Sup. Ct. 450, 36 L. Ed. 162, 164.

"The general scheme of the National Banking Act is that state banks may avail themselves of its privileges and subject themselves to its liabilities, without abandoning their corporate existence, without any change in the organization, officers, stockholders, or property, and without interruption of their pending business or contracts. All property and rights which they held before organizing as national banks are continued to be vested in them under their new status. Great inconveniences might result if this saving of their existing assets did not include pending executory

contracts, and pending guarantees, as well as vested rights of property. Although, in form, their property and rights as state banks, purport to be transferred to them in their new status of national banks, yet in substance there is no actual transfer from one body to another, but a continuation of the same body, under a changed jurisdiction. As between it and those who have contracted with it, it retains its identity, notwithstanding its acceptance of the privilege of organizing under the National Banking Act." *City National Bank* v. *Phelps,* 97 N. Y. 44, 50, 51.

We deem it clear that when The Thames Bank became The Thames National Bank it was a mere transition, a change of jurisdiction only and not the creation of a new bank with new stockholders. "The transition did not disturb the relation of either the stockholders or officers of the corporation. . . . These all remained the same under the national as they were under the state organization." *Coffey* v. *National Bank of Missouri,* 46 Mo. 140, 143. We cannot concur in the defendant's argument for a contrary conclusion based upon an extended examination of the change of powers and methods of business. Generally speaking, the corporate entity and the shares of its owners and stockholders are in no way affected or changed by the acquisition or surrender of some of the corporate powers.

The same principle applies where a bank withdraws from the national and returns to the state jurisdiction and again operates as a state bank. In our statute law prescribing the requirements for the organization of state banks or trust companies, there was, on January 1st, 1931, an express recognition of the continuity of the corporate existence and capital of banks which had theretofore exercised the powers of a national bank. General Statutes, Rev. 1930, § 3883. In *First*

*Commercial Bank* v. *Talbert,* 103 Mich. 625, 61 N. W. 988, which was a return to State control by a national association, reference was made to *City National Bank* v. *Phelps, supra,* the court saying that the question in the latter case was precisely analogous to the one there under consideration. This conclusion accords with the votes of the officers of The Thames National Bank: "Voted. That this bank, having voted to liquidate as a national banking association, does now resume under the General Statutes of this State all its rights and powers under its original charter from the State of Connecticut, granted in May, 1825. . . ."

The original investments of these plaintiffs had not lost their identity to the time of consolidation of The Thames Bank with The Bankers Trust Company; but the defendant insists that in any event that identity was destroyed when the consolidation took place and the plaintiffs accepted certificates for shares of The Thames Bank & Trust Company in place of their old certificates, and that this exchange was in effect a new and initial investment in shares of the consolidated bank and so taxable because made after April 1st, 1901.

It is provided in General Statutes, § 1286, that the investment in the original shares shall remain exempt, and "in case of the merger of any of the corporations referred to . . . then in the shares taken in exchange in such merger," shall be exempt. The defendant urges that this consolidation was not within the meaning and intent of § 1286, wherein the word used is "merger." We do not fail to recognize a distinction sometimes made between a technical "consolidation" and a "merger" of corporations. That distinction often depends upon the circumstances of the transaction, as was said in *Meyer* v. *Johnson & Stewart,* 64 Ala. 603, 643 *et seq.:* "The character of the con-

solidation is determined by the stipulations of the agreement." Where both the original corporations are extinguished and a new one is created, it is then considered a technical "consolidation." Such a transaction creates a new and distinct corporate entity, displacing and destroying both the original corporations. *Stamford* v. *Stamford,* 107 Conn. 596, 602, 141 Atl. 891; *St. Louis, I. M. & S. Ry. Co.* v. *Berry,* 41 Ark. 509, 518; *Meyer* v. *Johnson & Stewart,* 64 Ala. 603, 643 *et seq.; State* v. *Bailey,* 16 Ind. 46; *Ohio & M. Ry. Co.* v. *People,* 123 Ill. 467, 14 N. E. 874. But where one corporation remains in existence and absorbs the other, only the latter going out of existence, the transaction is technically a "merger." *Lee* v. *Atlantic Coast Line R. Co.,* 150 Fed. 775; *Vicksburg & Yazoo City Telephone Co.* v. *Citizens Telephone Co.,* 79 Miss. 341, 354, 30 So. 725. It is equally true that this technical distinction is not always recognized or observed. The meanings and implications attaching to these terms were examined exhaustively and in great detail in *Meyer* v. *Johnson & Stewart, supra,* at page 643 *et seq.,* and the conclusion reached that the word "consolidation" had not acquired "a recognized judicial construction." Syllabus, p. 604, par. 4; Bouvier's Law Dictionary (3d Ed.) Vol. 2, p. 2202. In the same work, Vol. I, p. 620, the reader is referred, on the subject of "Consolidation of Corporations," to the title "Merger."

It is quite clear that it was not the intention of our legislature to make this technical distinction so as to deny the exemption in the case of a consolidation and grant it in the case of a merger. "The argument for the respondent imputes to the lawmakers a subtlety of discrimination which they would probably disclaim." *Cortes* v. *Baltimore Insular Line, Inc.,* 287 U. S. 367, 375, 53 Sup. Ct. 173, 175.

The statute authorizing these banks to take the step, though entitled "two or more banks may consolidate," provides in terms that they "may, with the approval of the banking commission, *merge* or *consolidate* into a single corporation to engage in the business of a state bank or trust company or both." Public Acts of 1919, Chap. 258, § 1; General Statutes, § 3890. In subsequent sections of the Act, except in one instance, the word "consolidation" alone is used and it is expressly provided that, upon the completion of such a consolidation, the corporate existence of the consolidating corporations is continued in the new corporation "and it shall" possess all the rights, powers and franchises of both the consolidated corporations, their entire assets are to pass to it, without the necessity of any deed or transfer, and it is made liable for all their debts and obligations. General Statutes, § 3891, and following. The word "merger" describes a combination of two banks under these provisions with much more technical accuracy than does the word "consolidation." When the stipulation before us speaks of a "consolidation" of the banks, it is using that word in the sense in which it is used in the statutes and the true nature of the combination was really a merger. The vote of the directors of The Thames Bank & Trust Company, passed after the merger of The Bankers Trust Company, in which they authorized certain of their officers to apply to the Federal Reserve Bank for the cancellation of certain stock in it, stated to have been held by the president, directors and company of The Thames Bank, inaccurate as it is in details, evidently used the expression that that bank had ceased to exist only in a qualified sense, in order to take advantage of a provision in the Federal Reserve Act concerning the surrender of stock by a member

bank which had ceased to exercise its banking functions.

We recognize, as the defendant argues, that statutes granting tax exemptions should be strictly construed in favor of the sovereign, and that property sought to be held exempt must be clearly within the grant. *Yale University* v. *New Haven,* 71 Conn. 316, 329, 42 Atl. 87; *Stoughton* v. *Hartford,* 85 Conn. 674, 678, 84 Atl. 95; *Hartford* v. *Hartford Theological Seminary,* 66 Conn. 475, 482, 34 Atl. 483. It is also true, however, that such strict construction neither requires nor permits the contravention of the true intent and purpose of the statute as expressed in the language used. *Yale University* v. *New Haven,* and *Hartford* v. *Hartford Theological Seminary, supra.*

We are satisfied that General Statutes, § 1286, contemplates and includes the shares of The Thames Bank & Trust Company, now in question and held by these plaintiffs. They were "taken in exchange in such merger" of The Bankers Trust Company, in The Thames Bank & Trust Company, and are entitled to the exemptions therein granted.

In response to the interrogatories, we answer that the market value of the shares of The Thames Bank & Trust Company held by the respective appellants, is exempt from tax under the provisions of General Statutes, § 1286.

No costs will be taxed in this court.

In this opinion the other judges concurred.