ROLLING HILLS COUNTRY CLUB, INC. *v.* BOARD OF TAX REVIEW OF THE TOWN OF WILTON

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued March 6—decision released May 20, 1975

*Robert A. Fuller*, for the appellant (defendant).
*Melvin J. Silverman*, for the appellee (plaintiff).
*Arthur C. Williams* filed a brief as amicus curiae.

MACDONALD, J. The plaintiff, a privately owned club, appealed to the Court of Common Pleas from a decision of the defendant board which denied relief to the plaintiff on its appeal from the refusal of the Wilton tax assessor to classify and assess as open space land on the tax list of 1971 a tract of land used as a golf course. By way of relief, the appeal prayed for an order requiring the defendant board to assess the property in question as open space on that tax list and directing that the valuation of the property be reduced to reflect an open space classification. The court found the issues for the plaintiff and rendered judgment sustaining the appeal and adjudging that the land described in the complaint qualified as open space land, to be assessed as such. From that judgment the defendant has appealed.

The finding, which is based largely upon a stipulation of facts submitted to the trial court and which is not subject to material correction, discloses the

following facts: The plaintiff, a privately owned club open only to members and their guests, leases approximately 160 acres of land, part of which is developed as an eighteen-hole golf course. As a long-term lessee, the plaintiff has standing to maintain this appeal.[1] The property is valued in the customary manner as unimproved land in a two-acre residential zone.

During the month of June, 1963, the planning and zoning commission of the town of Wilton, acting as a planning commission, adopted a town plan of development consisting of a written plan and maps relating thereto which were affirmed by a final vote of the commission on June 25, 1963. The portion of the written plan relating to recreational use recites the need for preserving adequate park and recreation space and for acquiring additional space for such purposes.[2] It lists the plaintiff's golf course as an existing recreational facility of approximately 160 acres and states, with specific reference thereto, that "the Town should be ready to acquire this

[1] Although § 12-107e of the General Statutes provides that "an owner of land" may apply for open space land qualification, it further states that "any person aggrieved by the denial . . . of any application" may appeal therefrom. The printed record and the exhibits fail to disclose who signed or filed the original application for classification, but since it was stipulated by the parties that the plaintiff "as lessee has standing to maintain this appeal" and the court specifically so found, this question was not considered by the trial court nor was it raised or considered in the appeal.

[2] "As Wilton becomes more fully developed over the years just ahead, the need for park and recreation space will become more acute—at the same time that the chances of getting good, well-located recreation areas will decrease. . . . Most communities have grown without preserving enough land, among other things, for natural forest and for active recreation. This must not happen in Wilton if the Town is to retain its basic attraction as a good place to live. . . . In order to preserve some of the Town's open character, additional park and . . . [recreation] land acquisition will be recommended." Wilton Plan of Development, pp. 49–51 (1963).

facility if, in the future, the likelihood arises that the property may go into residential development." Two maps entitled "Wilton Planning and Zoning Commission Plan of Development" were filed June 11, 1963, in the office of the town clerk of Wilton, together with a similar map of larger scale with color designations. There was no designation on those maps of any property as "open space," but several areas, including the property under discussion, were designated "private recreation," and since at least 1966, the printed plan of development map included in the written plan of development, as disseminated by the commission and as posted in the commission's office, designates several areas on the map, including that under consideration, as "recreation—open space—private." The records of the commission do not disclose how and why the words "open space" first appeared on the current map, but on several occasions the commission, in making changes in the town plan of development, has made changes with reference to the current map.

From the foregoing facts the court concluded that by its public dissemination of the current map of the plan of development and by making changes in its town plan of development with reference to such map, the commission had adopted and endorsed the use of the map as its official map of the plan of development and had ratified the designation of the plaintiff's property as open space. The defendant board has assigned error in the court's reaching this conclusion, thereby raising as the first issue for our consideration the question whether the plaintiff's property had been designated as open space land on the Wilton plan of development so as to make it eligible for open space tax classification under the applicable statutes.

In 1963, the General Assembly enacted §§ 12-107a–12-107e of the General Statutes, which provided for preferential tax treatment of farmland, forest land and open space land. In its "[d]eclaration of policy," § 12-107a declares, in relevant part, "(a) that it is in the public interest to encourage the preservation of farm land, forest land and open space land . . . to conserve the state's natural resources and to provide for the welfare and happiness of the inhabitants of the state," and "(b) that it is in the public interest to prevent the forced conversion of farm land, forest land and open space land to more intensive uses as the result of economic pressures caused by the assessment thereof for purposes of property taxation at values incompatible with their preservation as such farm land, forest land and open space land."

Section 12-107b (c), after giving definitions of "farm land" and "forest land," defines "open space land" as any area of land "not excluding farm land, the preservation or restriction of the use of which would (1) maintain and enhance the conservation of natural or scenic resources, (2) protect natural streams or water supply, (3) promote conservation of soils, wetlands, beaches or tidal marshes, (4) enhance the value to the public of abutting or neighboring parks, forests, wildlife preserves, nature reservations or sanctuaries or other open spaces, (5) enhance public recreation opportunities, (6) preserve historic sites or (7) promote orderly urban or suburban development."

With the foregoing background of legislative intent and purpose in mind, we consider the specific question whether the plaintiff's land, at the time of the plaintiff's application to the tax assessor

for classification thereof as open space land on the tax list of 1971, had been designated upon the plan of development of the town of Wilton as an area "of open space land" within the meaning and under the provisions of § 12-107e, the relevant portions of which are set forth in the footnote.[3] It is not disputed that the commission formally adopted a town plan of development and maps related thereto in

[3] "[General Statutes] Sec. 12-107c. CLASSIFICATION OF LAND AS OPEN SPACE LAND. (a) The planning commission of any municipality in preparing a plan of development for such municipality may designate upon such plan areas which it recommends for preservation as areas of open space land. Land included in any area so designated upon such plan as finally adopted may be classified as open space land for purposes of property taxation if there has been no change in the use of such area which has adversely affected its essential character as an area of open space land between the date of the adoption of such plan and the date of such classification. (b) An owner of land included in any area designated as open space land upon any plan as finally adopted may apply for its classification as open space land on any assessment list of a municipality by filing a written application for such classification with the assessor of such municipality not earlier than thirty days before nor later than thirty days after the date of such assessment list. Such assessor shall determine whether there has been any change in the area designated as an area of open space land upon the plan of development which adversely affects its essential character as an area of open space land and, if he determines that there has been no such change, he shall classify such land as open space land and include it as such on such assessment list. An application for classification of land as open space land shall be made upon a form prescribed by the tax commissioner and shall set forth a description of the land, a general description of the use to which it is being put, and such other information as the assessor may require to aid him in determining whether such land qualifies for such classification. (c) Failure to file an application for classification of land as open space land within the time limit prescribed in subsection (a) and in the manner and form prescribed in subsection (b) shall be considered a waiver of the right to such classification on such assessment list. (d) Any person aggrieved by the denial by an assessor of any application for the classification of land as open space land shall have the same rights and remedies for appeal and relief as are provided in the general statutes for taxpayers claiming to be aggrieved by the doings of assessors or boards of tax review."

June, 1963, the final vote affirming prior action having been taken on June 25, 1963. Section 12-107e became effective the preceding day, on June 24, 1963, and whether or not the members of the commission were aware of its existence when they adopted the plan, which the defendant's brief claims "is incredible to assume," they did at that time designate the plaintiff's property on the maps as a "private recreation" area and referred to it specifically in the written plan as an area which the town should be ready to acquire "if, in the future, the likelihood arises that the property may go into residential development." The defendant, in its brief, makes much of the fact that the specific words "open space land" were not employed on the original maps and in the original text of the written plan, but § 12-107e simply states that the planning commission "may designate upon such plan areas which it recommends for preservation as areas of open space land," without requiring that the specific label of "open space land" be applied to each such area. This was made clear by the many diverse functions of land use listed under the statutory definition of that term contained in the then § 12-107b (c) as previously quoted, including, in addition to the seven specific uses enumerated, "forest land, land designated as wetland under section 22-7j [now § 22a-30] and not excluding farm land."

It was not the function of the planning commission to make a designation so worded as specifically to grant a reduced valuation for tax purposes. Its recommendations for uses of property in various areas are merely advisory. *State National Bank* v. *Planning & Zoning Commission,* 156 Conn. 99, 105, 239 A.2d 528. And in *Marshall* v. *Newington,* 156 Conn. 107, 239 A.2d 478, the farmland classification

for tax purposes was held to be applicable even where the property in question had been zoned for industrial purposes at the request of the owner. As we stated there (p. 113): "A declared purpose of the statute granting favorable tax treatment to farmland is to prevent its forced conversion to more intensive uses as a result of an assessment based on its market value rather than its current use." In both *Marshall* v. *Newington,* supra, and *Johnson* v. *Board of Tax Review,* 160 Conn. 71, 273 A.2d 706, we interpreted liberally the statute under consideration with respect to farmland, stating in *Johnson* (p. 73) that "[i]t is thus clear that §§ 12-107a— 12-107e, as derived from . . . [Public Acts 1963, No.] 490, are as much conservation statutes as they are tax relief measures. The declaration of policy in § 12-107a recites, inter alia, that it is in the public interest 'to conserve the state's natural resources.' Indeed, it would appear that the purpose of the tax relief is to aid the conservation effort, and not merely to aid food production itself."

If there are any ambiguities in the statute itself with respect to the specific term to be applied by the planning commission before property qualifies for designation as open space land, such ambiguities must be construed in favor of the plaintiff for, "[w]hen a taxing statute is being considered, ambiguities are resolved in favor of the taxpayer." *Consolidated Diesel Electric Corporation* v. *Stamford,* 156 Conn. 33, 36, 238 A.2d 410. And if there were any ambiguities or uncertainties about the designation of the plaintiff's land in June, 1963, they were resolved sometime during or prior to 1966 by the designation on the printed plan of development map in the written plan of development of certain areas, including the plaintiff's land, as "recreation—open

space—private." This was no amendment to the original plan but merely a clarification of it, and the official map, showing that designation, has been posted in the commission's office, disseminated by the commission, and used as the basis for changes in the plan of development.

Without regard to the use of the specific words "open space" on the map, it was clearly within the original plan of development, which became effective July 6, 1963, two weeks after the effective date of Public Acts 1963, No. 490, that the plaintiff's land should not be considered for residential use. The court did not err in concluding that the land in question had been designated as open space land on the Wilton plan of development.

The defendant's next claim of error is based upon its contention that "a private golf course and country club on developed land does not qualify for an open space tax classification." Stressing first the fact that the land has been developed, it makes the assertion that "[i]t is doubtful whether developed land qualifies for the open space" classification at all since "[t]he intention of Public Act 490 is to keep property from being developed." There is no merit to this claim since neither § 12-107b nor any other legislation pertaining to "open space land" requires that it be left in its pristine, natural state. Nowhere is the word "undeveloped" employed, and the specific inclusion of farmland clearly militates against any such requirement. The basic concept is that the land be "open," and not that it be entirely unused, undeveloped or unimproved. See General Statutes § 7-131c (b). It also is interesting to note that § 7-131c additionally defines "open space land" as "any land acquired under the provisions of sections 7-131c to 7-131k, inclusive" (the grant-in-aid

program) and refers to "recreational and conservation purposes" as specifically including use of land for golfing.[4]

The place of private golf clubs in the open space program was specifically referred to in the so-called Whyte Report, formally entitled "Connecticut's Natural Resources, A Proposal for Action," which was published by conservationist William H. Whyte in 1962[5] and clearly was available to the legislative committees considering the legislation in question. See hearings before Joint Standing Committee on State Development and Agriculture, Conn. Gen. Assembly, 1963 Sess., pp. 9-11; Tyler & Valentine, "The 1972 Open Space Conveyance Tax—Recapture or Reaction," 47 Conn. B.J. 332, 333.

The defendant makes the further claim that even though a public golf course might qualify as open space land under § 12-107b (c), which includes any area of land "the preservation or restriction of the use of which would . . . (5) enhance public recreation opportunities," a private golf club could not qualify because it is open only to members and their

---

[4] "[General Statutes] Sec. 7-131c. OPEN SPACE LAND. DEFINITIONS. As used in sections 7-131c to 7-131k, inclusive, (a) 'recreational and conservation purposes' means use of lands for agriculture, parks, natural areas, forests, camping, fishing, wetland preservation, wild life habitat, reservoirs, hunting, golfing, boating, swimming, snowmobiling, sanitary land fill, historic and scenic preservation and other purposes as set forth in section 7-131b . . . ."

[5] Whyte, "Connecticut's Natural Resources, A Proposal for Action," p. 51: "When the tax question is looked at from the community's point of view, it becomes evident that more than farmland is involved. There are other open space uses of private land which serve the public interest and which the public should reflect in its use of the taxing power. Three categories might be established: agricultural and forest, recreational, and resource land. Under recreation, for example, golf clubs could be registered; even though it may be private, the public does have an equity in this continued openness, and it should not tax it in new developments."

guests but not to the general public. It certainly is not arguable that the mere fact of private ownership and use of the land does not disqualify land from open space classification, for such ownership and use are implicit in the entire structure of open space legislation. Otherwise, there would be no purpose in even considering preferential tax treatment for privately owned farmland, forest land and other lands which qualify physically as open space land under the definitions given in § 12-107b (c).

The defendant further contends that the inclusion in § 12-107b (c) of land which would "(5) enhance public recreation opportunities" as one of the qualifying categories indicates an intention by the legislature that uses which would enhance private recreation would not so qualify. The short answer to this contention is that land used as a golf course, whether private or public, falls clearly within several of the other alternative categories enumerated in § 12-107b (c). It certainly would tend to "(1) maintain and enhance the conservation of natural or scenic resources" and "(4) enhance the value to the public of abutting or neighboring parks, forests, wildlife preserves, nature reservations or sanctuaries or other open spaces"; in many instances it tends to "(2) protect natural streams or water supply," and to "(3) promote conservation of soils, wetlands, beaches or tidal marshes" through the preservation of open areas of fields, grasses, ponds, streams and marshes and simply by the absence of buildings, filling operations and eroding factors introduced by residential or commercial developers. Although it is not necessary to qualify under category (5) as well as under one or more of the other categories mentioned above, it is even arguable that a private golf course indirectly

enhances public recreation opportunities by relieving the pressure on public golfing facilities and by frequently permitting "off-season" public uses of the golf course for sledding, skating and skiing.

In any event, "public use" is not one of the statute's criteria, for it is clear that this legislation is directed toward privately owned and privately used properties by the total absence of any requirement that designated properties be open to use by members of the general public. If public use properties already would be exempt from taxation under § 12-81 (4) or § 12-81 (5)[6] of the General Statutes, there would have been no purpose for the adoption of Public Acts 1963, No. 490, the clear intent of which is to promote conservation by offering a measure of tax relief to privately owned and privately used properties qualifying as open space land. And although it is true that, as argued by the defendant, tax exemption statutes, generally speaking, must be strictly construed in favor of the sovereign, this court has stated: "It is also true, however, that such strict construction neither requires nor permits the contravention of the true intent and purpose of the statute as expressed in the language used." *Jewett City Savings Bank* v. *Board of Equalization,* 116 Conn. 172, 185, 164 A. 643.

There is no error.

In this opinion the other judges concurred.

---

[6] The relevant portions of General Statutes § 12-81 provide exemption from taxation of "(4) Municipal property. Except as otherwise provided by law, property belonging to, or held in trust for, a municipal corporation of this state and used for a public purpose, including real and personal property used for cemetery purposes; (5) Property held by trustees for public purposes. As long as used by the public for public purposes, property held by trustees named in a will or deed of trust and their successors for this state or its people, one of its counties or its people or one of its municipal corporations or its people."