**CONNECTICUT PERFORMING ARTS FOUNDATION, INC.**

v.

**Hon. George F. BROWN, Tax Commissioner of the State of Connecticut.**

**Civ. No. B–83–295.**

United States District Court, D. Connecticut.

Jan. 7, 1985.

John P. Mulqueen, Jr., Groob, Ressler & Mulqueen, New Haven, Conn., Robert Wechsler, Stamford, Conn., for plaintiff.

Richard K. Greenberg, Asst. Atty. Gen., Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

ELLEN B. BURNS, District Judge.

This action is an appeal from a decision of the bankruptcy court in an adversary proceeding originally brought in the Connecticut Court of Common Pleas as an appeal from a revocation of a tax exemption by the state tax commissioner. The plaintiff, Connecticut Performing Arts Foundation ("CPAF"), filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in August, 1981. In November, 1981, CPAF removed the tax appeal to the bankruptcy court. After taking testimony and reviewing the record, the bankruptcy judge issued a decision on December 23, 1982, reversing the tax commissioner's revocation of CPAF's exemption and ordering the State of Connecticut to pay CPAF the amount of any funds collected from CPAF as a result of the revocation of the exemption. Because I construe the Connecticut law differently from the bankruptcy court and, in any event, disagree with the remedy, the decision of the bankruptcy court is reversed.

## I. FACTS[1]

CPAF is a nonprofit corporation organized and existing under the laws of the State of Connecticut. In 1962 CPAF applied to the Internal Revenue Service ("IRS") for a federal income tax exemption under § 501(c)(4) of the Internal Revenue Code ("IRC"). The IRS denied the exemption, in part because it found that the operators of the Oakdale Musical Theater Company ("Oakdale") controlled CPAF's operations to the financial advantage of Oakdale. CPAF filed an appeal of this determination but withdrew the appeal before it was acted upon.

Sometime prior to April 27, 1971, CPAF met with representatives of the Connecticut Tax Department in order to obtain an exemption from the Connecticut tax on admissions[2] which imposed a ten per cent tax on the sale of tickets to events such as those sponsored by CPAF, but permitted certain organizations to be exempted from

---

1. The facts are essentially as stated in the opinion below. I realize that the state asserts that the bankruptcy court's judgment is ineffective because the *judgment* was entered after the December 24, 1982, effective date of the *Northern Pipeline* decision, even though the *decision* was entered on December 23, 1982. Because I find that the opinion below must be reversed even under the facts as found by the bankruptcy court, I will not decide whether the bankruptcy court's decision should be reviewed *de novo* as a "proposed judgment" under § e(2)(A)(iii) of the Emergency Rule.

2. The tax in question in this suit, Conn.Gen.Stat. § 12–541, became effective on July 1, 1971. Prior to that date, an admissions tax law passed in 1969 was in effect. CPAF applied for exemption under both laws. It was denied an exemption under the 1969 law. That denial is not in issue at this time.

the tax.[3] CPAF claimed to qualify for an exemption because it was "of a similar nature" to an organization eligible for an exemption under § 501(c)(3) of the IRC.

At a hearing held on April 27, 1971, CPAF set forth facts showing that it was similar to organizations exempt under § 501(c)(3) of the IRC. It also disclosed that it had been denied an exemption under § 501(c)(4). In June, 1971, a new admissions tax was adopted by the Connecticut General Assembly and CPAF renewed its exemption application. Additional hearings were held on September 17 and 29, 1971, and on or about April 5, 1972, the tax commissioner ruled that CPAF was qualified for an exemption from the 1971 act. The exemption was made retroactive to July 1, 1971.

On April 27, 1973, the tax commissioner sent CPAF a letter advising CPAF that its exemption would expire at the end of 1973 unless CPAF obtained a ruling from the IRS that it qualified for a federal tax exemption. CPAF contested the commissioner's ruling at a hearing held on December 26, 1973. On January 25, 1974, the commissioner advised CPAF that its exemption was withdrawn because a "subsequent investigation by the department revealed that the organization was denied an exemption from federal income tax on March 9, 1962..." After a rehearing conducted on June 26, 1974, the tax commissioner ruled on December 11, 1974, that the exemption

was properly revoked because of "new information", namely the March 9, 1962, denial of CPAF's application for a federal income tax exemption. CPAF brought its appeal to the Court of Common Pleas on January 5, 1975, and removed the action to the bankruptcy court in November, 1982.

The bankruptcy court reviewed the commissioner's decision to revoke the exemption pursuant to Conn.Gen.Stat. § 12–554.[4] It found that the commissioner was aware of the 1962 IRS ruling when he granted CPAF's exemption. Therefore, since there was no "new information" to justify revoking the exemption, the bankruptcy court reversed the commissioner's ruling and ordered a refund of all admissions taxes paid by CPAF. The state has taken a timely appeal from the bankruptcy court's ruling.

## II. JURISDICTION

The State of Connecticut argues that the bankruptcy court was without jurisdiction in this matter for two reasons. It claims, first, that the Eleventh Amendment and the doctrine of sovereign immunity bar the entry of a monetary judgment against the state and, second, that the state court proceeding was improperly removed to the bankruptcy court.

### A. *Eleventh Amendment*

 The state claims that the bankruptcy court was without jurisdiction to order it to refund taxes to CPAF by virtue

---

**3.** During all relevant times Conn.Gen.Stat. § 12–541(b) provided:

No tax shall be imposed under subsection (a) of this section with respect to admission charges all the proceeds of which inure exclusively to

(1) organizations exempt from income taxes under the United States Internal Revenue Code; or

(2) in the absence of a ruling by the Internal Revenue Service organizations determined to be of a similar nature.

**4.** Section 12–554 provides in applicable part: Any taxpayer aggrieved because of any order, decision, determination or disallowance of the tax commissioner under the provisions of sections 12–540 to 12–556 may, within one month after service upon the taxpayer of notice of such order, decision, determination, or

disallowance, take an appeal therefrom.... Said court may grant such relief as may be equitable....

The section does not define the standard of review to be applied by the reviewing court. The bankruptcy court appeared to review the commissioner's ruling *de novo*, and took extensive testimony. Because I find that the bankruptcy court erred in its application of law and in the remedy granted, it is not necessary to determine the applicable standard of review under section 12–554. However, because tax appeals are explicitly exempted from the deferential review provided by the Connecticut Administrative Procedure Act, *see* Conn.Gen.Stat. § 4–186, it may be assumed that the Connecticut legislature intended to give the courts wider latitude in reviewing tax commissioner's determinations.

of the Eleventh Amendment and the doctrine of sovereign immunity. It is true that, absent its consent, a state may not be sued in federal court. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, ——, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). Furthermore, a suit against a state official is not permitted when the relief sought is the payment of money by the state as compensation for "a monetary loss resulting from a past breach of a legal duty." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974).[5] Therefore, absent some bar to the application of the doctrine of sovereign immunity, the bankruptcy court should not have entertained this action.

Section 106(a) of the Bankruptcy Code, 11 U.S.C. § 106(a), provides that "[a] governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose." The state argues that this waiver is not applicable in this case because it is a waiver of "sovereign immunity," and not a waiver of the Eleventh Amendment. However, closer analysis shows that the immunity applicable in this case is sovereign immunity, and not the Eleventh Amendment.

■ By its terms, the Eleventh Amendment prohibits suits in federal court "commenced or prosecuted by one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." (emphasis supplied) The amendment does not itself prevent suits against a state by its own citizens. However, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court determined that the policy behind the Eleventh Amendment, namely state sovereignty, prevented a federal court from entertaining a suit brought against a state by its own citizens.

The technical distinction between Eleventh Amendment "immunity" and sovereign immunity was noted by the court in *Pennhurst:*

That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that *the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given:* not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification. *Ex Parte State of New York No. 1,* 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921) (emphasis added)

465 U.S. at ——, 104 S.Ct. at 907. *See also, Parden v. Terminal R. Co.,* 377 U.S. 184, 192, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964).

Because the Eleventh Amendment is an "exemplification" of the doctrine of sovereign immunity, it is understandable that the amendment has come to be used as a shorthand expression of the principle that a state may not be sued by either its own citizens or citizens of another state. However, in determining the extent of the waiver contained in § 106(a), it is necessary to differentiate between the doctrine of sovereign immunity and the application of the Eleventh Amendment.

■ Because CPAF is a "citizen" of the State of Connecticut, it is the doctrine of sovereign immunity that can be asserted by the state, and not the Eleventh Amendment. Therefore, if the waiver of sovereign immunity contained in § 106(a) is ef-

---

**5.** CPAF asserts that since its action is one for a refund of taxes wrongfully collected, it is not an action for damages but an action for return of property. This position was rejected by the Supreme Court in *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

fective as a legitimate exercise of congressional authority, and is applicable in this case, the bankruptcy court could exercise its jurisdiction over the state.

In *Parden v. Terminal R. Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court was confronted with the question of whether the Federal Employee Liability Act (FELA) permitted a suit against a state in federal court. The Court noted that a state can consent to a suit in federal court and also noted that, in adopting the Constitution, the states "surrender a portion of their sovereignty when they granted Congress the power to regulate commerce." *Id.* at 191, 84 S.Ct. at 1212. The court went on to note that when a state engaged in an activity subject to the commerce power, in that case operating a railroad, it necessarily consented to suits under the FELA. *Id.* at 192, 84 S.Ct. at 1212.

■ Similarly, the states have granted Congress authority under the bankruptcy clause of the Constitution. When a state engages in an activity that is subject to the bankruptcy power, it is proper for Congress to find that the state has waived its sovereign immunity.[6] Section 106(a) provides that, when a governmental unit has made a claim against the estate, it has waived its immunity with respect to claims against the state that arose out of the same transaction.[7] By making a claim against the estate, the state subjects itself to the bankruptcy power of the United States. The waiver of immunity provided by § 106(a) is therefore a proper exercise of congressional authority.

6. It is not now necessary to address whether Congress has authority under the bankruptcy clause to waive a state's Eleventh Amendment immunity in suits by citizens of other states.

7. In *Parden, supra,* the court found that the state had consented to suit under the FELA even though the FELA did not expressly provide for the waiver of sovereign immunity. The waiver provisions of § 106 show a more explicit intent to permit suits against states and give the states fair notice of the consequence of asserting claims against the estate. Courts will find a

■ The state has not argued that its claim against the estate did not arise out of the same transaction as CPAF's claim against the state. The state's claim is a claim for admissions taxes that had not been paid by CPAF after the tax commissioner had revoked CPAF's exemption. CPAF's claim against the state is also for taxes paid after the commissioner revoked the exemption. Both claims arise out of the same transaction, the revocation of the exemption, and therefore, § 106(a) permits the bankruptcy court to exert jurisdiction over CPAF's claim against the state.

B. *Removal*

The state argues that the bankruptcy judge erred in allowing removal of this action because Interim Rule 7004, adopted in this district as Local Rule 7004, only permits removal of a state court action within thirty days of the order for relief.[8] Because the application for removal was filed nearly three months after the order for relief, the state asserts that removal should not have been permitted.

The bankruptcy judge conducted hearings on whether to permit removal, and was persuaded by the reasoning of *In re Circle Litho, Inc.*, 12 B.R. 752 (Bkry.Conn. 1981), which held that the thirty-day limitation of Rule 7004 was not mandatory. The *Circle Litho* court noted that, unlike the thirty-day removal limit of 28 U.S.C. § 1446 for cases removed to the district court, Rule 7004's limit was not statutorily required. Section 1478, which authorizes removal of cases from state courts to the bankruptcy court, does not contain any time limit. In drafting Rule 7004 the Advisory Committee stated that the time limit

waiver of sovereign immunity by the most express language or "by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 34 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)).

8. In a voluntary case, such as this, the commencement of the case constitutes an order for relief. 11 U.S.C. § 301.

was derived from § 1446. *See Collier on Bankruptcy,* Appendix 1, 1092 (1983). However, the fact that the committee was guided by a statutory provision does not give the rule the force of law of a statute.

■ Because the time limitation is contained in a rule, the *Circle Litho* court saw no reason why Rule 906 which generally permits enlargement or reduction of time limits set by the rules should not apply. 12 B.R. at 756. Rule 906(b)(2) permits application for an enlargement of time after the expiration of the relevant time period, where the failure to act was the result of excusable neglect.[9] The bankruptcy court heard evidence and argument and found that enlarging the time for removal was appropriate. The state has not made any showing to this court that the bankruptcy court erred in determining that enlargement was appropriate under the facts presented.

## III. STATUTORY INTERPRETATION

■ The State of Connecticut argues that, because CPAF was denied an exemption from IRS in 1962, the commissioner was without authority under the admissions tax statute to grant an exemption. The commissioner argues that, through inadvertence or otherwise,[10] the 1962 denial was not drawn to his attention at the time the exemption was granted in 1972. When he learned of the denial, he acted in compliance with the law in revoking the exemption. He further claims that, in light of the IRS ruling, he was without authority to grant CPAF·an exemption. If an administrative agency's ruling is not within the authority granted by statute it is a nullity. *United States v. Larionoff,* 431 U.S. 864,

97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). Therefore, if the commissioner exceeded the grant of authority to issue exemptions found in § 12–541(b)(2), it was proper for him to revoke the exemption, or to treat it as being without effect.

Section 12–541(b)(2) permits the commissioner, "in the absence of *a ruling* by the Internal Revenue Service ...", to grant an exemption to an organization of a "similar nature" to an organization exempt from taxation under the IRC (emphasis added). CPAF argues that this statute should be interpreted to mean that the commissioner is not precluded from granting an exemption based on *any* IRS ruling and that he would only be precluded if the IRS ruling were under the specific tax code section under which the applicant claims exemption by reason of a similarity to an exempt organization. Since CPAF was denied an IRS exemption under § 501(c)(4), its application for an admissions tax exemption based on its similarity to a § 501(c)(3) organization would not be precluded.

■ CPAF's interpretation of the statute is a reasonable one. However, Connecticut case law is clear that laws granting tax exemptions should be strictly construed against the applicant. *Caldor, Inc. v. Heffernan,* 183 Conn. 566, 571, 440 A.2d 767 (1981); *Connecticut Theater Foundation, Inc. v. Brown,* 179 Conn. 672, 677, 427 A.2d 863 (1980). Although a court should not construe a statute in such a way as to prevent "a reasonable and rational result," *Stone v. Sullivan,* 154 Conn. 498, 503, 227 A.2d 76 (1967), strict construction of an exemption statute is required if it would not contravene the "intent and purpose of the statute as expressed in the language used." *Jewett City Savings*

---

**9.** The state argues that since CPAF did not apply for an enlargement of time, permitting such an enlargement was improper. However, CPAF applied for removal after the time period had passed and the state objected because the application was untimely. It was not an abuse of discretion for the bankruptcy court to treat the late application as an application for an enlargement of time. Because the state raised its timeliness objection it was not prejudiced by the bankruptcy court so treating the application.

**10.** The commissioner points out that, even if CPAF informed the tax department of the 1962 denial at the April 27, 1971, hearing, at a hearing held in December of 1973, CPAF was maintaining that it withdrew its application for an IRS exemption before a final ruling was issued. The commission points out this discrepancy to demonstrate that there was some confusion even among CPAF's representatives as to the existence or non-existence of a prior IRS ruling.

*Bank v. Board of Equalization*, 116 Conn. 172, 185, 164 A. 643 (1933). The legislature permitted the commissioner to grant an exemption only if the organization had qualified for an IRS exemption or if the IRS had not issued *a ruling*. Uncontroverted testimony was presented to the bankruptcy court that, when originally presented to the legislature, the admissions tax act only allowed exemptions to organizations that had received IRS exemptions. The "similar nature" exemption was added to take into account smaller organizations, such as PTAs, which do not normally seek IRS exemptions. *See e.g.,* testimony of Patrick Marangell, p. 9, October 14, 1982. The legislature could well have reasoned that organizations too small to seek an IRS determination of any sort should be allowed to avoid the IRS administrative process and apply directly to the commissioner. However, an organization that had the motivation and capability of seeking an IRS ruling would be required to have an IRS exemption before it would qualify for an exemption under the admissions tax act. It is clear from the statutory language that the legislature wanted IRS criteria to apply to the granting of an exemption. It would therefore be preferable to have the IRS make a determination of eligibility for an exemption, and only permit the commissioner to determine eligibility if the IRS has not issued any ruling at all. Once the IRS has issued any ruling, the commissioner would be bound by that determination unless the organization sought a new ruling from the IRS.[11] In other words, the commissioner only had authority to grant an exemption if there had been either a favorable ruling by the IRS or no IRS ruling whatsoever.[12]

The clear language of § 12–541(b)(2) only permits an exemption if the IRS has not issued *a ruling*. Strictly construing this statute against the party seeking an exemption, and in a manner which is rational and reasonable in light of the language used by the legislature, the commissioner was without authority to issue an admissions tax exemption in 1972. It was therefore incumbent upon the commissioner to revoke that exemption when he became aware of his error. The bankruptcy court's order reversing the commissioner must itself be reversed.

## IV. THE REMEDY

Even if the bankruptcy court had been correct in its determination that the revocation of the exemption was improper, its order for repayment to CPAF of the amount of funds collected as a result of the exemption was improper. The admissions tax is "imposed upon the person making such charge [for admission] and reimbursement for the tax shall be collected by such person from the purchaser." Conn.Gen. Stat. § 12–541(a). Thus, rather than being a direct tax on the theater operator, the tax is a "transactional tax," like a sales tax, imposed upon the theater's patrons. *Cf. Agricultural National Bank v. State Tax Commissioner*, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968) (the purchaser is the true taxpayer of a sales tax.) CPAF does not deny that it collected the ten per cent tax on each of its tickets sold during the relevant period. It now seeks a refund for

---

11. CPAF attempts to stress the difference between its denial of an IRS exemption under § 501(c)(4) and its application for an admissions tax exemption based on § 501(c)(3). In actuality, the criteria for these two exemptions are essentially the same. *See* Bittker, "The exemption of Non-Profit Organizations from Federal Income Taxation," 85 Yale L.J. 299, 346–47 (1976).

The IRS denied CPAF's tax exemption in 1962 because it was operated in such a way as to provide a benefit to a private corporation. Unless there has been a change in CPAF's method of operations, which does not appear on the

record, it is unlikely that CPAF would qualify for a § 501(c)(3) exemption. In fact, CPAF applied for a § 501(c)(3) exemption in 1973, but withdrew the application when it discovered that the IRS was aware of its denial in 1962. *See* Testimony of Robert Hall, Jr. Nov. 5, 1982, p. 175.

12. In 1982 the statute was amended to remove all discretion from the commissioner in evaluating an organization's eligibility. Only organizations that have received IRS exemptions may receive an admissions tax exemption. Conn. Gen.Stat. § 12–541 (1983).

a tax that it never paid, except as a conduit of the taxes paid by its customers.

 In *Spencer v. Consumers Oil Co.*, 115 Conn. 554, 162 A. 23 (1932), the Connecticut Supreme Court faced an analogous situation. A gasoline dealer had collected a sales tax from its patrons but did not pay the money collected over to the state, claiming that the gasoline tax statute was invalid. The court found that it did not need to address the defendant's contentions regarding the validity of the statute because, by collecting the tax, the defendant had obligated itself to pay the money over to the treasurer. *Id.* at 559, 162 A. 23. The court stated that "the defendant has in good conscience no right to retain this money and is charged with a heavy moral obligation to make the payment." *Id.* at 562, 162 A. 23.[13]

 CPAF attempts to argue that it did pay the tax by noting that it had stamped a legend on the back of its tickets, informing its patrons that it had applied for an exemption and, if the exemption was granted, the amount of tax charged would be added to the admissions charge. CPAF claims that this legend created a contract between itself and its patrons entitling CPAF to keep the tax paid if an exemption was granted.

This position is without merit for several reasons. First, CPAF made no showing that the legend appeared on the tickets after the revocation of the exemption. Second, the legend misrepresents CPAF's position in that it states that CPAF had applied for an exemption, when in fact, during the relevant period, CPAF was appealing from a revocation of an exemption. Finally, and most significantly, CPAF has simply failed to show that the legend created an enforceable contract right.

 The front of the tickets bore the admissions price, an amount denominated as tax, and the total price. Presumably, a customer paying for his ticket paid the total price, believing that he was paying for his admission and any applicable tax. It would only be after purchasing his ticket that the customer might possibly become aware of the legend on the reverse of the ticket. General principles of contract law preclude a finding that the legend became part of the contract of admission. *Malone v. Santora*, 135 Conn. 286, 291–92, 64 A.2d 51 (1949); *Carter v. Reichlin Furriers*, 34 Conn.Sup. 661, 665, 386 A.2d 647 (App. Sess.1977). *See also* A. Corbin, *Corbin on Contracts* § 107 (1963) ("meeting of the minds" required for a valid contract.) Furthermore, Connecticut's "anti-scalping" statute, Conn.Gen.Stat. § 53–289, establishes a policy in favor of *fixed* ticket prices. In light of this policy, an attempt to vary the price by stamping a legend on the back of the ticket must be viewed as ineffective. Therefore CPAF had no contract right to keep any refund of taxes that might be ordered.[14] Since the parties who would have been entitled to receive such a refund, CPAF's customers, were not before the court, the ordering of a refund to CPAF was an improper remedy.[15]

13. CPAF has argued that, prior to removal, the state court judge granted CPAF's demurrer to the state's affirmative defense of unjust enrichment, thereby creating the "law of the case" which is binding on this court. That argument is spurious for at least three reasons. First, sitting as a court of appeals, this court may review decisions made below. Second, even if the affirmative defense was properly stricken, the bankruptcy court must consider the issue of unjust enrichment in fashioning an equitable remedy. Finally, the Connecticut Supreme Court has clearly stated that "the law of the case" is not *res adjudicata* so as to prevent the making of correct decisions later in a case. *Barnes v. Schlein,* 192 Conn. 732, 734, 473 A.2d 1221 (1984).

14. Contrary to CPAF's contention, *Connecticut Theater Foundation v. Brown*, 179 Conn. 672, 427 A.2d 863 (1980) does not indicate that such a legend may create an enforceable contract right. *Connecticut Theater* found instead that designated portions of revenue collected as a tax should be turned over to the state. *Id.* at 676, 427 A.2d 863.

15. Because the admissions tax statute was changed in 1982, CPAF would not now be entitled to an exemption since it has not received an exemption from the IRS. See note 12, *supra.* Therefore, the bankruptcy court's order reversing the commissioner's revocation of CPAF's exemption is moot and without effect. It is not necessary, therefore, to determine whether such

*Conclusion*

The bankruptcy court's decision is reversed. The adversary proceeding is hereby dismissed with costs to the defendant.

SO ORDERED.

an order would violate the Supreme Court's holding in *Pennhurst, supra,* that a federal court cannot order a state official to comply with state law.